Sherry L. McEVERS, Plaintiff,

v.

Michael J. ASTRUE [1], Commissioner of Social Security, Defendant.

No. 1:06–cv–36 RWP–TJS.

United States District Court,
S.D. Iowa,
Western Division.

Oct. 31, 2007.

---

1. Michael J. Astrue became the Commissioner of Social Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Linda McMahon as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

Gregory W. Peterson, Elverson Vasey & Peterson LLP, Des Moines, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Sherry L. McEvers, filed a Complaint in this Court on October 17, 2006, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for benefits on June 11, 2002. Tr. at 134–36 & 391–93. Plaintiff claimed to have become disabled March 4, 2002. Tr. at 134. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge (ALJ) James M. Mitchell on June 29, 2004. Tr. at 42–75. The ALJ issued a Notice Of Decision—Unfavorable on December 21, 2004. Tr. at 405–18.

On June 20, 2005, the Appeals Council remanded the case to the ALJ. Tr. at 429–32. The Appeals Council noted that the ALJ had found depression to be a severe impairment, but that he had failed to make findings regarding the severity of the impairment; that the record contained insufficient evidence from the treating psychiatrist; that the decision did not contain a function-by-function assessment of Plain-

tiff's ability to do work related activities. Tr. at 430–31. The ALJ was given instructions to correct the deficiencies. Tr. at 431–32.

While Plaintiff's case was pending at the Appeals Council, she filed a new set of applications on February 15, 2005. Tr. at 458–60

A remand hearing was held on October 12, 2005 before ALJ Jan E. Dutton. Tr. at 76–107. The ALJ issued a Notice of Decision—Unfavorable on November 10, 2005. Tr. at 19–39.

In her decision, the ALJ found that Plaintiff is insured to receive benefits until September 30, 2009. At the first step of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. At the second step, the ALJ found that Plaintiff has the following severe impairments: fibromyalgia and degenerative joint disease. The ALJ found that dysthymia is not a severe impairment in this case. The ALJ found that Plaintiff's impairments are not severe enough to qualify for benefits at the third step of the sequential evaluation. The ALJ stopped the sequential evaluation at the fourth step of the sequential evaluation, finding that Plaintiff is able to perform her past relevant work as a programmer analyst. Tr. at 38. The ALJ found that Plaintiff is not disabled and is not entitled to the benefits for which she applied. Tr. at 39.

On September 19, 2000, Lloyd I. Maliner, M.D., of Neurology and Neurosurgery Associates in Winter Haven, Florida, wrote to G. Bruce Clement, M.D., also of Winter Haven. Dr. Maliner wrote that he saw Plaintiff with a chief complaint of neck pain which radiates into the right and left upper extremities with numbness. Plaintiff also reported headaches in the occipital region. Plaintiff said the pain becomes worse when working on a computer, and relieved with ice. Tr. at 190. After an examination, Dr. Maliner recommended that Plaintiff try cervical traction. Tr. at 191. Plaintiff was given a prescription for Esgic, and told to return to the clinic in two to four weeks. Tr. at 192. An MRI, taken on August 24, 2000, showed degenerative changes in Plaintiff's neck at C5–6. A bone spur which was starting to impinge on the spinal cord was considered to be a possible etiology of the pain radiating into the arms. Tr. at 89. Plaintiff saw Dr. Maliner again on October 12, 2000. Plaintiff said that she had a constant headache. She said that traction relieves her headache as long as she is in the device. Tr. at 219. The doctor gave Plaintiff a soft cervical collar to wear when she was in a fixed position, such as working at a computer. He instructed her not to wear it all the time. Dr. Maliner said that he would refer Plaintiff to a neurologist. Tr. at 220.

On August 24, 2001, Plaintiff saw Shailesh Rajguru, D.O., at Neurology and Neurosurgery. Dr. Rajguru noted that Plaintiff's headaches had been treated with Ultram, Vioxx, Darvocet, muscle relaxants, pain management consultation, trigger point injections, physical therapy, and Elavil. At the time of the examination, Plaintiff was taking Vioxx, Prempro, Lipitor, Xanax, Trazodone, Synthroid, and Neurontin. Tr. at 194. After the examination, Dr. Rajguru wrote that Plaintiff's headaches appeared to be tension type, as opposed to migraine. Plaintiff was referred to a pain management specialist. Tr. at 196.

A Lumbar MRI dated August 29, 2001, showed mild annular bulge at L4–L5, moderate bilateral facet arthropathy, and mild to moderate bilateral facet arthropathy at L5–S1. There was no compressive herniation or foraminal stenosis seen. Tr. at 221.

Plaintiff sought treatment for depression and anxiety at Winter Haven Behavioral Health. Treatment notes are dated from

intake interview on July 29, 2002 through September 10, 2002. Tr. at 280–89. Plaintiff reported that she had quit her job in March 2000 because she was missing so much work due to anxiety and depression. "Client reports she does not care about her appearance much anymore, has passive infrequent suicidal ideation, recent memory loss, poor concentration, chronic pain (was recently [diagnosed] with Fibromyalgia), and deals with panic attacks once or twice a week. Client has no friends." Tr. at 286.

Plaintiff was seen for a disability examination on October 23, 2002, by Floyd A. Jones, D.O. in Shenandoah, Iowa. Tr. at 291–96. The doctor diagnosed fibromyalgia, (see fibromyalgia evaluation sheet on which 11 of the control points were positive, Tr. at 296), depression and chronic fatigue syndrome secondary to fibromyalgia, hypothyroidism, menopause, degenerative arthritis and disc disease of the cervical spine with grade 1 posterior subluxation C5 on 6 and foraminal narrowing C5–6 on the right. The doctor wrote:

I think lifting and carrying of any frequency whatsoever of any significant weight is out of the question for this patient. She should probably not lift over 5 pounds and this should be infrequent. She cannot stand, move about, walk or sit for an eight hour day. She frequently has to change positions. She would be unable to do stooping, climbing, kneeling and crawling. She seems to be able to handle objects fairly well. Although she complains of decreased hearing, I could not on just routine exam notice this. She has good speech and seems to see adequately. Work environment including dust and fumes would be no more hazardous to her than to the rest of the population. However, temperature extremes I think would probably aggravate her fibromyalgia and arthritis in the neck.
Tr. at 293.

Plaintiff was seen for a psychological evaluation by Russell A. Moulton, M. S., Licensed Psychologist, on January 3, 2003. Tr. at 321–24. As a part of the mental status examination, the Beck Depression Inventory, 2nd Edition, was administered. This showed the degree of Plaintiff's depression to be in the higher end of the severe range of the scale. Plaintiff reported feelings of guild, disappointment, and self blame. Tr. at 322. Mr. Moulton wrote that Plaintiff gave the appearance of someone who is depressed, and that the symptoms of depression and anxiety were creating clinically significant distress and impairment. He said that it would be appropriate for Plaintiff to seek mental health care to learn coping mechanisms and to help Plaintiff with her suicidal thoughts. Tr. at 323. The diagnoses on Axis I were major depressive disorder, recurrent, severe, and panic disorder without agoraphobia. Tr. at 324.

Plaintiff was seen by George Young, III, M.D., a psychiatrist at Waubonsie Mental Health Center in Clarinda, Iowa, February 3, March 3, and March 24, 2003. Tr. at 333–36. It is obvious that these pages of records are not Plaintiff's complete treatment chart from the clinic. The focus of the psychiatric treatment seemed to be assisting Plaintiff's withdrawal from Xanax and to deal with her symptoms of anxiety and depression.

Dr. Young's record begins again with a visit on December 17, 2003. The doctor noted that Plaintiff was "doing so much better than a year ago." Plaintiff was learning to be less dependent on her mother and step father, and was going to church where she was meeting new people. The doctor noted that Plaintiff's depression was being treated with Effexor. Tr.

at 585. On February 4, 2004, Dr. Young noted that Plaintiff "continues to do better and better." Plaintiff had cut her dosage of Trazodone in half, a decision with which the doctor agreed. Tr. at 582. On March 3, 2004, Dr. Young wrote that Plaintiff was working. He said that Plaintiff was earning about $8,000 a year. Plaintiff had been asked by her boss to work full time, but she didn't think her back would allow her to do it. The diagnoses were dysthymia and alcohol abuse, unspecified. Tr. at 581. On April 5, 2004, Plaintiff was "doing great." Plaintiff was working and looking forward to a visit with her son. Tr. at 580. Plaintiff continued doing better when seen on May 10, 2004. Tr. at 579. On June 7, 2004, Dr. Young wrote that Plaintiff was doing fine with less anxiety. The doctor noted that Plaintiff was on a church board and was going to start bowling in the fall. Tr. at 578. At the hearing, Plaintiff testified that she was never able to begin bowling because she began having problems with her wrist and hand. Tr. at 97. On August 9, 2004, Plaintiff reported more anxiety, but the doctor thought in was related to the 20 ounces of caffeine she was drinking in the morning. Tr. at 576. On September 7, 2004, Dr. Young noted that Plaintiff was doing well, working 20 to 25 hours, and was an officer in her church where she was meeting people. Tr. at 575. On November 29, 2004, Plaintiff reported that she had been fired from her cashier job because she sold cigarettes to an underage man. Although Plaintiff cried for two weeks, she was looking for work as a telephone operator. Dr. Young wrote that Plaintiff "definitely needs to be looking for jobs as this is the only real long term solution to her dilemma." Tr. at 570. When she was seen on January 3, 2005, Plaintiff was doing well and had a job at a clothing store. Plaintiff was going to church which the doctor said was good for her. Tr. at 569. On March 7, 2005, Plaintiff was not sleeping well, but her new job was not stressful, and there was no more conflict with her parents. The doctor gave Plaintiff some medication for insomnia. Tr. at 567. On May 2, 2005, Dr. Young noted that Plaintiff was doing fine, working 20 hours a week at the clothing store. Plaintiff did not think she could work more because of her back. Tr. at 565. The final entry from Dr. Young is dated June 8, 2005, at which time Plaintiff was doing reasonably well working and going to church. Tr. at 563.

On June 29, 2004, Plaintiff was seen by Rheumatologist Jay G. Kenik, M.D. at Creighton University Medical Center in Omaha, Nebraska. Tr. at 356–61. The doctor noted that Plaintiff was working 20 hours per week as a cashier. The job allowed Plaintiff to move around and to sit periodically. There was no significant lifting and stressors were relatively mild in the job. Tr. at 356. The doctor's physical examination noted diffuse tender points—18 of 18. Dr. Kenik's diagnoses were classic fibromyalgia and cervical spondylosis. Tr. at 257. The doctor also completed a residual functional capacity form. The following symptoms were identified: Multiple tender points; non-restorative sleep; chronic fatigue; morning stiffness; muscle weakness; subjective swelling; irritable bowel syndrome; frequent, severe headaches; numbness and tingling; anxiety; panic attacks; depression; hypothroidism; chronic fatigue syndrome. Tr. at 359. The doctor wrote that Plaintiff could walk 10 city blocks without rest. He said she could sit 30 minutes at a time, and stand for an hour, each for about 4 hours. He opined that she would need to take unscheduled breaks during an 8–hour work day. Tr. at 360. Dr. Kenik wrote that Plaintiff could occasionally lift up to a maximum of 10 pounds. He said because of the severity of her symptoms, Plaintiff would be absent from work 3 or more times per month. Finally, the doctor wrote that

Plaintiff would need to have the opportunity to alternate sitting and standing at will. Tr. at 361.

Plaintiff began treatment at Clarinda Medical Associates on July 8, 2003, where she saw Emmanuel Sarpong, M.D. On physical examination, the doctor noted several tender spots in her back and shoulders. After the examination, the doctor diagnosed fibromyalgia, hypothyroidism, degenerative joint disease, obesity, and hyperlipidemia. Tr. at 385. When Plaintiff was seen again on November 4, 2003, for a medication refill, she had lost about 10 pounds. Plaintiff had several diffused trigger point tenderness in her shoulders, back and front, over the chest, on her upper arms, low back and upper thigh. Tr. at 382. Plaintiff went to see Dr. Sarpong on June 25, 2004. She expressed frustration about her present health status and the fact that she did not have the resources to adequately care for herself. She told the doctor about the headaches which are severe enough that they prevent her from sleeping. "The difficulty however is that when it comes on, she is unable to work and she wants to sleep." Plaintiff also mentioned the morning stiffness and shooting pains in her back. Dr. Sarpong noted Plaintiff's feeling of depression: "... she is talking today that having no insurance is like a death warrant. She is not suicidal, but she says she feels down and has excessive times of crying." The doctor felt that the degenerative joint disease was Plaintiff's most debilitating problem. Regarding the fibromyalgia, the doctor felt that the lack of other symptoms may indicate other collagen vascular problems, but that he was unable to investigate them because of the cost. Tr. at 372. Dr. Sarpong wrote that both Plaintiff's depression and headaches could be treated more aggressively if there were funds for medication. Tr. at 373. On July 1, 2004, Dr. Sarpong wrote that he had reviewed, and agreed with, the residual functional capaci-

ty form submitted by Dr. Kenik. Tr. at 368. On August 7, 2006, Dr. Kenik submitted a second residual functional capacity form which was much the same, if not identical, to his earlier form. On the second form, next to the lifting restriction, the doctor wrote that Plaintiff ability to occasionally lift up to ten pounds, "is limited to activities of daily living, not in a competitive work place environment." Tr. at 612.

On August 7, 2006, Plaintiff underwent a vocational evaluation at Manpower in Des Moines, Iowa. Tr. at 601–06. Stephanie Mackey, a staffing specialist, administered the Coordinated Rapid Movement and the Data Skills Plus assessments. Ms. Mackey wrote that Plaintiff put forth a valiant effort to complete each of the assessments the results were not the result of a lack of effort on Plaintiff's part. Tr. at 601. On the data skills test Plaintiff achieved an overall rating of fair (Tr. at 603) which indicated she would likely be slow paced and not very productive when entering alphanumeric information into a computer system. Tr. at 602.

At the hearing on October 12, 2005, Plaintiff testified that she was 55 years old. Tr. at 85. Plaintiff testified that the last full time job she held was that of a bank teller. She was fired from the job because she was not doing the job correctly because of her inability to concentrate. Tr. at 87. Plaintiff said that she was currently working as a salesclerk at a clothing store. Tr. at 90. She said that after four hours she is "completely exhausted." Plaintiff described the work place:

> I can stand up, sit down, I mean, it's a very relaxed, I mean the two owners and myself are the only employees I think that work there and her mother so it's kind of, you know, I can go back and sit in the office and they even have a couch downstairs if I need to lay down.

Tr. at 91. Plaintiff was asked if she had joined the bowling league referred to in the medical records. She testified that arthritis in her hand and wrist prevented her from that activity. Tr. at 97.

After Plaintiff testified, the ALJ called Patricia Reilly to testify as a vocational expert. Tr. at 100. The ALJ, the claimant, and the vocational expert agreed that Plaintiff's only past relevant work was as a computer programmer. Tr. at 102. The ALJ's first hypothetical was:

> If she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk or sit for six hours in an eight hour day and could occasionally do all postural activities, climbing, balancing, stooping, kneeling, crouching, crawling, should not work on ladders, ropes, scaffolds, or with hazards such as dangerous equipment or heights. With that functional capacity, could she return to her past work?

The vocational expert's response that Plaintiff could do her past work as a programmer/analyst. Tr. at 103. The next question assumed that Plaintiff would not lift or carry anything greater than 10 pounds and would not be on her feet for more than two hours in an eight hour day. The vocational expert again testified that Plaintiff would be able to do her past relevant work, and would also be able to do other jobs to which her skills would transfer. Tr. at 104–105. Finally, the vocational expert testified that if Plaintiff needed to rest and lie down after four hours of work, regular full time employment would be precluded. Tr. at 105–06.

## DISCUSSION

■ Our role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole. *Baker v. Barnhart*, 457 F.3d 882 (8th Cir.2006.); *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir.2000). Substantial evidence is

evidence that a reasonable mind would find adequate to support the ALJ's conclusion. *Lacroix v. Barnhart*, 465 F.3d 881 (8th Cir.2006). In considering the evidence, we must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir.2006). We will disturb the ALJ's decision only if it falls outside the available "zone of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir.2006). An ALJ's decision is not outside the "zone of choice" simply because we might have reached a different conclusion had we been the initial finder of fact. *Id.* Consequently, we may not reverse the decision to deny benefits unless the record contains insufficient evidence to support the outcome. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994).

*Nicola v. Astrue*, 480 F.3d 885, 886–87 (8th Cir.2007.)

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975).

■ In a Social Security disability case, the claimant bears the burden to prove that she has not worked since the alleged onset of disability date because of one or more severe impairments. If the impairments are not severe enough to qualify for benefits at the third step of the sequential evaluation, the claimant must still show the inability to perform past relevant work. Although the ALJ determines the claimant's residual functional capacity at the fourth step, at the fifth and final step of the sequential evaluation the burden shifts to the Commissioner to show the existence of jobs that can be per-

formed given the claimant's age, education past relevant work, and residual functional capacity.

In *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), the Court wrote that in a disability case "probably the most important issue is the question of [residual functional capacity]." The Court went on to write: "The [residual functional capacity] that must be found . . . is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."

■ Although the ALJ must assess residual functional capacity based on all the evidence in the record, it is a medical question and must be supported by some medical evidence. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001) (some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.) quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir.2000).

■ This Court agrees with the ALJ that Plaintiff's primary impairments are physical in nature. However, this was not always the case. In January of 2003, Plaintiff's diagnoses included major depressive disorder, recurrent, severe, and panic disorder without agoraphobia. In February and March of 2003, Plaintiff sought treatment from Dr. Young who assisted her withdrawal from Xanax as well as treating her symptoms of anxiety and depression. By December of 2004, Plaintiff's depression was effectively treated with medication, and the focus of treatment was Plaintiff's relationship with her family. By the time Plaintiff appeared for her second hearing, the medical evidence supported the finding that her mental impairments were no longer severe. In the

opinion of the Court, major depression should have been found to be a severe impairment from the onset of Plaintiff's disability until December 2003. Even after Plaintiff recovered from depression, the medical evidence establishes that Plaintiff has been unable to work because of degenerative changes in her neck and fibromyalgia which includes chronic fatigue.

The first doctor to comment on the limitations imposed by fibromyalgia and cervical spine problems was Doctor Jones. After his examination of October 23, 2002— recall that the alleged onset of disability date is March 4, 2002—the doctor opined that Plaintiff is unable to any significant lifting "whatsoever." He also opined that Plaintiff is unable to stand, move about, walk or sit for an eight hour work day. Dr. Jones' evidence detracts from the finding made by the ALJ.

Dr. Kenik, a Rheumatologist at Creighton University, diagnosed classic fibromyalgia and cervical spondylosis. In addition, Dr. Kenik said that Plaintiff has chronic fatigue as well as frequent, severe headaches. On two occasions, the doctor expressed his opinion that Plaintiff is not able to work on a full time basis, and that any lifting she is able to do would only involve self care, rather than the ability to lift in a competitive work setting. Dr. Kenik's evidence detracts from the findings of the ALJ.

Plaintiff's treating physician, Dr. Sarpong, wrote that degenerative joint disease was Plaintiff's most debilitating problems. This, in combination with fibromyalgia, prevents Plaintiff from working according to Dr. Sarpong.

■ Dr. Bumgarner examined Plaintiff, but it appears that the only background information he received was a few treatment notes from Dr. Sarpong. He did not have copies of consultations from the or-

thopedist, psychiatrists or rheumatologist. Nor was Dr. Bumgarner given copies of x-ray reports. The doctor opined that Plaintiff's conditions would not be limiting with regard to a work environment. The question, of course, is whether Dr. Bumgarner's report is substantial evidence to support the ALJ's decision. In *Hancock v. Secretary of Dept. of Health, Education, and Welfare*, 603 F.2d 739, 740 (8th Cir. 1979), the Court wrote: "In our opinion the report of a consulting physician who examined the claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Dr. Bumgarner's report is contradicted by two treating physicians and by Dr. Jones' consultation. Therefore, it cannot be said that it is substantial evidence in support of the ALJ's decision.

In addition to the medical evidence outlined above, the report of the vocational analysis done at Manpower, showed that in spite of a valiant effort, Plaintiff was only able to work at a slow pace. This report, too, detracts from the ALJ's decision.

When the vocational expert, at the hearing, was told to consider Plaintiff's testimony, including the need to take rest periods, it was her testimony that Plaintiff is unable to work. In *Ness v. Sullivan*, 904 F.2d 432, 436 (8th Cir.1990), the Court noted its repeated holdings that vocational testimony elicited by hypothetical questions that fail to relate with precision the physical and mental impairments of the claimant cannot constitute substantial evidence to support the Commissioner's decision. The Court continued: "The ALJ's failure to include rest periods in his hypotheticals forecloses the use of the vocational expert's testimony to support the Secre-

tary's decision in this case." In the case at bar, the vocational expert, herself, raised the issue of rest periods and testified that such a need would preclude competitive employment.

In *Gavin v. Heckler*, 811 F.2d 1195 (8th Cir.1987), the Court, after explaining in detail the duty of a reviewing court under the substantial evidence on the record as a whole test, wrote, at 1201:

When the record is thus analyzed, we find little or no substantial evidence on the record as a whole to support the Secretary. Ordinarily, where the Secretary has incorrectly allocated the burden of proof base upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

Likewise, in the case at bar, the a remand for further evidence would only delay the receipt of benefits to which the claimant is entitled.

## CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is not supported by substantial evidence on the record as a whole. The case is reversed and remanded for payment of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See*

---

**2.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the gov-

ernment in the case that the applicant alleges were not substantially justified."

*also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.